**IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION**

**CIVIL CASE NO. 1:08cv501**

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | ) |
| | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **and** | ) |
| | ) |
| **SARA HONGISTO,** | ) |
| | ) |
| **Intervenor Plaintiff,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **NORTH AMERICAN LAND CORPORATION,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## MEMORANDUM OF DECISION

**THIS MATTER** is before the Court on the Plaintiff-Intervenor's Motion for Default Judgment [Doc. 20] and the Plaintiff Equal Employment Opportunity Commission's Motion for Default Judgment [Doc. 21].

## PROCEDURAL HISTORY

On October 28, 2008, the Equal Employment Opportunity Commission (EEOC) initiated this action against the Defendant to correct unlawful employment practices on the basis of sex pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §§2000e, *et. seq*. [Doc. 1]. A request for waiver of service was sent to the registered agent for the Defendant on October 28, 2008. [Doc. 2]. On November 7, 2008, the signed waiver was returned. [Doc. 3-1]. The following language appeared immediately above the signature line on the form: "I understand that a judgment may be entered against North American Land Corporation if an answer or motion under Rule 12 is not served upon you within sixty (60) days after October 28, 2008." [Id.]. No answer or motion was filed by the Defendant. On January 28, 2009, the Clerk of Court entered default in favor of the EEOC against the Defendant. [Doc. 7].

On February 9, 2009, the Magistrate Judge granted the motion for leave to intervene of Sara Hongisto. [Doc. 8]. Her intervenor complaint was filed on February 12, 2009. [Doc. 9]. She sought the same relief as that stated in the complaint filed by the EEOC. Hongisto filed proof of service of the intervenor complaint on the Defendant but no answer or motion in response was filed by the Defendant. [Doc. 14]. On April 14, 2009, the Clerk of Court entered default in favor of Hongisto against the Defendant. [Doc. 16].

The Plaintiff and Intevenor Plaintiff thereafter moved for default judgment.

## STANDARD OF REVIEW

When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default.

If the plaintiff's claim is for a sum certain or a sum that can be made certain by computation, the clerk – on the plaintiff's request, with an affidavit showing the amount due – must enter judgment for that amount and costs against a defendant who has been defaulted for not appearing[.]

In all other cases, the party must apply to the court for a default judgment.

Fed.R.Civ.P. 55(a) & (b).

In this case, the Plaintiff and Intevenor Plaintiff have applied to the Court for default judgment on the basis of affidavits.


## DISCUSSION

**Compensatory damages.**

"Prior to Congress's enactment of [42 U.S.C.] Section 1981a, victims of intentional gender ... discrimination were only entitled to equitable relief under Title VII."[1] McKinnon, 83 F.3d at 506. "The damages provisions of 42 U.S.C. §1981a, part of the Civil Rights Act of 1991, [now] provide for the availability

---

[1]The complaint in this action alleged that the sexual discrimination was intentional. [Doc. 1, at ¶9]. "When a court enters a default judgment against a defendant, all allegations in the complaint must be taken as true." McKinnon v. Kwong Wah Restaurant, 83 F.3d 498, 506 n.5 (1st Cir. 1996).

of compensatory damages to victims of intentional discrimination in violation of Title VII." Id. The statute, however, contains a maximum amount which may be recovered for non-economic damages;[2] that is, "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses[.]" 42 U.S.C. §1981a(b)(3); Sasaki v. Class, 92 F.3d 232, 235 (4th Cir. 1996). The statutory "cap" limits the amount of compensatory damages depending on the number of employees continuously employed by the company at issue. 42 U.S.C. §1981a(b)(3). The complaint here alleges that the Defendant continuously employed at least fifteen employees. [Doc. 1, at ¶4]. In its memorandum supporting the motion for default judgment, the EEOC claims that the Defendant continuously employed more than one hundred employees during the relevant time period. [Doc. 22, at 2]. However, no evidence in support of that statement, such as an affidavit, was submitted. Hyster v. Ethel Hedgeman Lyle Academy, 2009 WL 1850912 (E.D.Mo. 2009). As a result, the Court finds the appropriate statutory limitation to be more than fourteen but less than one hundred and one employees. See, 42 U.S.C. §1981a(b)(3)(A) ("in the case of a respondent who has more than 14 and

---

[2]This "cap" does not apply to medical expenses or back pay incurred prior to judgment. 42 U.S.C. §2000e-5(g); see, e.g., Salinas v. O'Neill, 286 F.3d 827, 829 (5th Cir. 2002), rehearing denied 37 Fed.Appx. 715 (5th Cir. 2002).

4

fewer than 101 employees" compensatory damages may not exceed $50,000 for each complaining party).

In considering a motion for an award of compensatory damages in connection with a motion for default judgment, damages "may be awarded only if the record adequately reflects the basis for award via 'a hearing or a demonstration by detailed affidavits establishing the necessary facts.'" Adolph Coors Co. v. Movement Against Racism & The Klan, 777 F.2d 1538, 1544 (11th Cir. 1985) (citation omitted); S.E.C. v. Smyth, 420 F.3d 1225, 1232 n.13 (11th Cir. 2005) ("An evidentiary hearing is not a *per se* requirement; indeed, Rule 55(b)(2) speaks of evidentiary hearings in a permissive tone."); KPS & Assocs. v. Designs by FMC, Inc., 318 F.3d 1, 21 (1st Cir. 2003) (where all of the facts necessary to a finding of damages are "of record," a hearing is not required).

> [A] plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress ...; however, the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that [discrimination] occurred supports an award of compensatory damages.

Price v. City of Charlotte, N.C., 93 F.3d 1241, 1254 (4th Cir. 1996), *certiorari denied* 520 U.S. 1116, 117 S.Ct. 1246, 137 L.Ed.2d 328 (1997). Factors which a court may consider include the following: (1) the loss of esteem from

peers; (2) physical injury resulting from emotional distress; (3) psychological counseling or treatment; (4) loss of income or other pecuniary expense; (5) the degree of emotional distress; (6) the context of the events surrounding it; (7) evidence tending to corroborate the plaintiff's testimony; (8) the connection between the conduct at issue and the distress; (9) medical treatment rendered due to the distress; and (10) mitigating factors. Id. (other citations omitted).

The EEOC has submitted the affidavits of five women who were employed by the Defendant during the relevant time period in support of its request for an award of compensatory damages. The Intervenor Plaintiff, Sara Hongisto (Hongisto), also submitted an affidavit. The Court will first consider the compensatory damages sought by Hongisto.

### Sara Hongisto

In Hongisto's affidavit, she described in detail the behavior of her supervisors, Jack Gallira (Gallira) and Donald Shattuck (Shattuck), which was sexually and physically aggressive.[3] [Doc. 20-5]. Among the behavior to which Hongisto was subjected was a continuing stream of verbal sexual harassment, such as the comment by Shattuck that he really appreciated her

---

[3]The Court notes that Hongisto's description of their conduct is corroborated by the testimony contained in the affidavits of the other five women. Price,93 F.3d at 1254.

work "and someday I will let you know by whipping out my cock and letting you suck it." [Id., at 2]. Other comments were not only derogatory toward women in general but threatening towards any woman who complained. [Id., at 4]. Hongisto was physically assaulted by kissing and "groping" of her buttocks. [Id., at 2-3]. Hongisto stated that she dreaded answering the telephone at work because she was afraid either Gallira or Shattuck was calling. [Id.]. She no longer trusted any co-workers and dreaded coming to work at all. [Id.]. After she complained about the harassment, their behavior actually intensified. [Id.]. Hongisto began to have anxiety attacks and worried that co-workers were looking through her desk. [Id., at 5]. She lost confidence in her ability to do her job, namely be a real estate agent, and feared that Gallira and Shattuck would have a violent reaction to her having reported them to superiors. [Id.]. She also testified that as a result of this anxiety, she became depressed and began to drink a bottle of wine each night, going to bed around six and not caring for her minor son. [Id.]. She stopped cooking meals or cleaning her home and fought constantly with her boyfriend. [Id.]. On a daily basis, Hongisto threw up from anxiety. [Id.]. Ultimately, after resigning, Hongisto began to contemplate suicide, not only due to the actual harassing behavior but also because of her loss of confidence stemming from that behavior. [Id., at 6]. In January 2007, she

admitted herself to the Copestone Psychiatric Unit at Mission Hospital where she stayed for seven days. [Id.]. She was humiliated by the hospitalization. [Id.]. As a result of her hospitalization, the Department of Child Services conducted an investigation of her ability to care for her son. [Id., at 6-7]. Hongisto was diagnosed with acute stress disorder, situational bipolar disorder and post-traumatic stress disorder. [Id.]. She lost her home and she and her son lived in a camper behind her brother's home for six months. [Id., at 7]. She continues to take multiple anti-anxiety and anti-depressant medications. [Id.]. Hongisto has not been able to maintain regular employment. [Id.]. At the time of the affidavit in 2009, she was working on a farm in exchange for room and board. [Id., at 8]. While employed by the Defendant in 2006, she earned about $18,000. [Id.]. She earned less than $8,000 in 2007 and less than $4,000 in 2008. [Id.]. Hongisto stated that prior to her experience as an employee of the Defendant, she had never had mental health issues. [Id., at 6-8]. She also submitted as an attachment to her affidavit copies of her medical records, including treatment records and Medicaid verification of treatment. The records show that the charge for Copestone totaled $8,902.79 of which half was paid by the North Carolina Division of Medical Assistance; *i.e.*, Medicaid. [Doc. 20-]. Hongisto did not state in her affidavit that she paid the other half of the bill. All of Hongisto's

other medical bills, including prescription drugs, were paid by Medicaid. [Doc. 20-7].

The Court finds that Hongisto has shown demonstrable emotional distress having a nexus to the harassment suffered at the hands of her supervisors while employed by the Defendant. Price, 93 F.3d at 1254; Sloane v. Equifax Information Services, LLC, 510 F.3d 495, 503 (4th Cir. 2007) (specific events causing humiliation detailed). Her description of the impact of that behavior on her emotional well-being is carefully articulated and not conclusory. Id. She suffered physical symptoms, such as nausea and debilitating depression, stemming from the emotional distress. Bryant v. Aiken Regional Medical Centers, Inc., 333 F.3d 536, 546 (4th Cir. 2003), certiorari denied 540 U.S. 1106, 124 S.Ct. 1048, 157 L.Ed.2d 891 (2004) (nausea and vomiting); Price, 93 F.3d at 1254. Those symptoms show the degree of emotional distress and her physicians diagnosed a direct relationship between the harassment and the stress related symptoms.[4] Id.; Sloane, 510 F.3d at 503 (plaintiff offered objective verification of her emotional distress). Hongisto has remained in continuous treatment for her psychological condition and continues to take anti-anxiety and anti-depressant

---

[4]Hongisto's psychiatrist also submitted an affidavit containing her diagnoses and the physician's opinion that they were caused by emotional distress. [Doc. 20-6].

medication.  Id., at 504; Doe v. Chao, 306 F.3d 170, 180 (4ᵗʰ Cir. 2002),

certiorari denied 539 U.S. 957, 123 S.Ct. 1204, 157 L.Ed.2d 1122 (2004)

(physician diagnosed major depressive disorder requiring medication); Price,

93 F.3d at 1254-55.  In addition, her income has steadily decreased.  Id.

Although Hongisto continues to attempt work, she has been unable to work

full time or at more than menial labor.  Sloane, supra.

The Court finds that an award to Hongisto of statutory compensatory

damages in the amount of $50,000 is supported by the evidence.  42 U.S.C.

§1981a(b)(3)(A).  Hongisto also seeks an award of compensatory damages

for medical expenses she incurred in the amount of $11,182.43.  Even though

the collateral source rule allows for the recovery of amounts incurred by the

Plaintiff and paid by collateral sources such as Medicaid, Plaintiff is not

entitled to recover for adjustments to medical bills negotiated between

Medicaid and the healthcare providers.  Miciotto v. United States, 270 Fed.

Appx 301 (5ᵗʰ Cir. 2008).  Based on the medical bills submitted by the Plaintiff

and the information there in about the Medicaid credits, the Court finds that

Hongisto is entitled to recover for her medical bills in the amount of $9,447.81.

Title VII provides that a court finding unlawful employment discrimination

may order "such affirmative action as may be appropriate, which may include

... backpay[.]" 42 U.S.C. §2000e-5(g); Alvarado v. Federal Express Corp.,

2010 WL 2465339 (9th Cir. 2010) (statutory cap does not apply to back pay and equitable relief available pursuant to §2000e-5(g)). Hongisto stated in her affidavit that she was hired by the Defendant on January 15, 2006 as a part-time secretary. [Doc. 20-5, at 1]. She has presented no evidence of her initial salary. She stated that on July 23, 2006, she was promoted to a real estate sales agent. [Id.]. Later in her affidavit, Hongisto stated that she had an annual salary of $25,000 plus sales commissions but her actual salary for that year was $18,000 because she did not earn any sales commissions. [Id., at 8]. Hongisto's attorney, however, claimed that her salary was $25,000 and based his computation of back pay on that amount. [Doc. 20-2, at 6]. After deducting the amounts she earned in 2007, 2008, and 2009,[5] Hongisto's attorney claimed she was "entitled to back pay of approximately $53,000. [Id.]. The Court is unable to ascertain the amount of back pay sought from this incomplete and ambiguous disclosure. "A plaintiff is not permitted to throw [her]self on the generosity of the [court]. If [s]he wants damages, [s]he must prove them." Bracey, 368 F.3d at 119. The Court is not in a position to estimate Hongisto's post-employment economic damages in the face of such inadequate evidence. Tse v. UBS Financial Services, Inc., 568 F.Supp.2d

---

[5]Hongisto earned $7,236 in 2007 and $3,671 in 2008. [Doc. 20-5, at 8]. At the time she signed her affidavit in October 2009, she was "working for room and board only" but no amount was specified.

274, 305 (S.D.N.Y. 2008).

## Emily T. Layton

Emily Layton (Layton) worked for the Defendant as a salesperson from January 9, 2006 until April 21, 2006. [Doc. 21-3, at 1]. Gallira was the regional sales manager and had supervisory authority over Layton and all of the Defendant's employees. [Id., at 1-2]. The first time she met Gallira, she extended her hand for a handshake but he grabbed her and kissed her on the mouth. [Id.]. Layton stated in her affidavit that at least once a week, Gallira would inappropriately rub her shoulder and constantly made comments with sexual innuendo. [Id., at 3]. On three to four different occasions, she caught Gallira trying to look up her skirt. [Id.]. Like Hongisto, Layton finally stopped wearing skirts to work in order to avoid this behavior from Gallira. [Id., at 3-4]. Gallira repeatedly made comments about the bodies of other women and generally used derogatory language when referring to women. [Id.]. Layton was directly supervised by Shattuck who worked in the same office. [Id., at 5]. Shattuck also used derogatory language toward women. [Id.]. Layton began to obsess about what to wear to work in order to avoid Gallira's harassment. [Id., at 6]. She stopped going to any social function which involved work. [Id.]. Layton began to have trouble sleeping and thought she might have sleep apnea. [Id.]. When Layton sought medical treatment, her physician told her

that she was having extreme anxiety related to work. [Id.]. Layton also had panic attacks. [Id.]. She resigned her job rather than continue to put up with the harassing conduct. [Id.].

Layton's affidavit is corroborated by that of Hongisto. Price,93 F.3d at 1254. Her testimony concerning the impact that her anxiety had on her physical health is also shown by her physician's statement that her sleep disturbance stemmed from work anxiety. [Id.]. This amounts to a physical injury resulting from the emotional distress. [Id.]. Although the time period during which she sustained this harassment was relatively short compared to Hongisto, it is clear there is a connection between the harassment and the emotional distress. [Id.]. The Court finds that Layton's affidavit establishes demonstrable emotional distress which she articulated in specific detail. [Id.]. Layton described the specific offending conduct and its effect on her. [Id.]. The Plaintiff seeks recover for Layton in the amount of $30,000, [Doc. 21 at 1], and the Court finds that damages in that amount are supported by the evidence.

**Beth M. Loveday**

Beth Loveday has provided an affidavit in which she states that while employed by the Defendant, she was supervised by Gallira from February 2006 through December 2006. [Doc. 21-4, at 1]. Gallira repeatedly hugged

Loveday without invitation. [Id., at 2]. He routinely came up behind her while she was working and hugged her and kissed her head. [Id.]. Loveday, like Hongisto and Layton, stated that Gallira constantly made sexually offensive and derogatory remarks about women. [Id.]. Once when she could not find something, Gallira told her to "get off your fucking fat ass and find it." [Id.]. This offended Loveday so much that she left work for the day. [Id.]. Although there was a vacant office, Loveday and another female worker shared an office in order to avoid ever being alone with Gallira. [Id., at 3]. Like Layton and Hongisto, Loveday stated that there was no sexual harassment training and she never received a handbook or any instruction about how to complain. [Id., at 3-4]. Because Loveday never knew what to expect from Gallira, she would get so nervous that she suffered from stomach aches and headaches. [Id.].

Loveday's affidavit is corroborated by that of Hongisto and Layton. Price, 93 F.3d at 1254 Her testimony concerning the impact that her anxiety had on her physical health is also shown by her symptoms of stomach aches and headaches. [Id.]. There was, therefore, a physical injury resulting from the emotional distress. [Id.]. The fact that Loveday shared an office in order to avoid being alone with Gallira is further objective proof of the severity of the emotional distress. The almost ten month period during which she sustained

this harassment was extensive and it is clear there is a connection between the harassment and the emotional distress. [Id.].    The Court finds that Loveday's affidavit establishes demonstrable emotional distress which she articulated in specific detail.    [Id.].  Loveday described the specific offending conduct and its effect on her. [Id.].  The Plaintiff seeks recover for Loveday in the amount of $15,000, [Doc. 21 at 1], and the Court finds that damages in that amount are supported by the evidence.

### Jaime Winnett

Winnett worked in the same office as Loveday and was supervised by Gallira from February 2006 through December 2006. [Doc. 21-5, at 1-2].  She stated that ninety per cent of the time she had to interact with Gallira, he inappropriately hugged her and made comments containing sexual innuendo. [Id.].  The only time when he did not act inappropriately was when another male employee was present. [Id.].  In April 2006, she was driving with Gallira to look at a piece of real estate. [Id., at 2].  She had her cell phone between her legs so that she could reach it if it rang. [Id.].  While she was driving, Gallira asked for her cell phone and she handed it to him.  [Id.].  "[i]nstead of hading it back to [her], he placed the phone in between [her] legs and pushed it up against [her] vagina.  He then proceeded to wiggle the phone around against [her] vagina before removing his hand," [Id. at 3], all the while looking

at her. [Id.]. Winnett did not know what to do but felt this was a sexual assault and she was afraid if she said anything he would fire her. [Id.]. Gallira then told her to stop at a liquor store and when she did, he bought a bottle of vodka from which he drank for the remaining twenty minutes it took to drive. [Id.]. Winnett was very nervous around Gallira and began to have panic attacks when he came into the office. [Id., at 6]. She lost her appetite and frequently lost her temper for no reason. [Id., at 6-7]. She began to be anxious in the presence of any man and always watched his hands. [Id.].

Winnett's affidavit is corroborated by that of Hongisto, Layton and Loveday. Price, 93 F.3d at 1254. Her testimony concerning the impact that her anxiety had on her physical health is also shown by her symptoms of panic attacks, loss of appetite, temper outbursts and fear of men. [Id.]. There was therefore a physical injury resulting from the emotional distress. [Id.]. The physical assault which she suffered from Gallira and the almost ten month period during which she sustained this harassment was extensive and it is clear there is a connection between the harassment and the emotional distress. [Id.]. The Court finds that Winnett's affidavit establishes demonstrable emotional distress which she articulated in specific detail. [Id.]. Winnett described the specific offending conduct and its effect on her. [Id.]. The Plaintiff seeks recover for Winnett in the amount of $15,000, [Doc. 21 at

1].  The Court, however, finds that the damages incurred by Ms. Winnett support and warrant an award in the amount of $40,000.

### Julie M. Kelly

During a two month period in March and April 2006, Kelly was the subject of sexual harassment by Gallira who was the regional sales manager and thus, her supervisor. [Doc. 21-6, at 1-2].  During the ten to fifteen times that Kelly had to interact with Gallira, he routinely gave her inappropriate hugs. [Id.].  Kelly also witnessed Gallira's harassment of Hongisto and Layton as well as another employee, Lisa Shepherd. [Id.].  They all discussed his behavior and all found it harassing. [Id.].  In addition, Gallira constantly demeaned and ridiculed female employees as well as customers. [Id., at 2].  He constantly touched them without invitation. [Id.].  Gallira stayed in a cabin near the office when he was in town. [Id., at 3].  On one occasion, he asked Kelly to go to his cabin and fix the remote control on the television. [Id.].  When she arrived, she learned that the television was in his bedroom and while she fixed it, he stood behind her watching. [Id.].  Kelly knew that Gallira could have easily done the repair himself. [Id.].  Kelly was relieved that a male co-worker came into the cabin unexpectedly and believed that this prevented Gallira from touching her. [Id., at 3-4].  Like the others, Kelly never was provided with sexual harassment training, information about a policy or handbook.  [Id.].  Although she

complained about Gallira, no one did anything. [Id., at 4]. Kelly was also subjected to sexual harassment by Shattuck who was her direct supervisor. [Id.]. She also witnessed Shattuck's sexually abusive behavior toward other women who worked in her office. [Id., at 5]. When Kelly complained to Shattuck and told him to leave her alone, he retaliated. [Id.]. One day in April 2006, she called in sick because she could not tolerate his behavior and he fired her. [Id., at 5-6]. Kelly could not sleep, lost weight and became extremely nervous. [Id., at 6]. She was terrified of being alone with either man after the incident at the cabin. [Id.].

Kelly's affidavit is corroborated by that of the other women. Price, 93 F.3d at 1254. Her testimony concerning the impact that her anxiety had on her physical health is also shown by her symptoms of sleeplessness and weight loss. [Id.]. Based thereon the Court finds that there was a physical injury resulting from the emotional distress. [Id.] The fact that Kelly was subjected to retaliatory behavior after complaining is further objective proof of the severity of the emotional distress. Although the period during which she sustained this harassment was rather short, the harassment was severe and it is clear there is a connection between the harassment and the emotional distress. [Id.]. The Court finds that Kelly's affidavit establishes demonstrable emotional distress which she articulated in specific detail. [Id.]. Kelly described the specific

offending conduct and its effect on her. [Id.].  The Plaintiff seeks recover for Kelly in the amount of $10,000, [Doc. 21 at 1], and the Court finds that damages in that amount are supported by the evidence.

## Valerie W. Koehler

Koehler was a sales person supervised by Gallira from February 2006 through December 2006. [Doc. 21-7, at 1-2].  She was constantly subjected to unwanted hugging and sexual comments from Gallira. [Id.].  He stared at her breasts when she had to talk with him.  [Id.].  He told jokes of a sexual nature to all of the women and made inappropriate comments.  [Id., at 2-3].  Koehler was particularly nervous because Gallira had the ability to decide whether she could sell a piece of property or accept an offer for property.  [Id., at 3].  Although she complained about him, nothing was done and no policy was in place.  [Id.].  She became increasingly anxious any time she was around Gallira and constantly complained to her husband.  [Id., at 4].

Koehler's affidavit is corroborated by that of the other women.  Price, 93 F.3d at 1254.  Her testimony concerning the impact that her anxiety had on her physical health is also shown by her increasing anxiety and difficulties with her marriage. [Id.].  The fact that Koehler was afraid of retaliatory behavior after she complained is further objective proof of the severity of the emotional distress.  The almost ten month period during which she sustained this

harassment was extensive and it is clear there is a connection between the harassment and the emotional distress. [Id.].  The Court finds that Koehler's affidavit establishes demonstrable emotional distress which she articulated in specific detail.  [Id.].  Koehler described the specific offending conduct and its effect on her. [Id.].  The Plaintiff seeks recover for Koehler in the amount of $5,000, [Doc. 21 at 1], and the Court finds that damages in that amount are supported by the evidence.

**Attorney's fees.**

Title VII provides that the Court may award reasonable attorney's fees to the prevailing party as part of the costs. 42 U.S.C. §2000e-5(k)  Hongisto seeks an award of attorney's fees as the prevailing party and her attorney has submitted his affidavit in support thereof. [Doc. 20-3].  In claiming attorney's fees, the prevailing party in a Title VII action has the burden of producing specific evidence of the prevailing market rates in the relevant community for the type of legal work performed.  Depaoli v. Vacation Sales Associates, L.L.C., 489 F.3d 615, 622 (4th Cir. 2007).  "The market rate should be determined by evidence of 'what attorneys earn from paying clients for similar services in similar circumstances,' which, of course, may include evidence of what the plaintiff's attorney actually charged his client."  Id., *quoting* Rum

<u>Creek Coal Sales, Inc. v. Caperton</u>, 31 F.3d 169, 175 (4th Cir. 1994).

In support of the motion for attorney's fees, Hongisto's attorney submitted an affidavit in which he stated:

> My normal fee in a case of this nature is $250.00 per hour. My hourly rate is at or below the rate charged by other attorneys in the Asheville community with similar experience and background in representing clients in matters of this nature.

[Doc. 20-3, at 2].

Nothing more is provided and no affidavits from other attorneys have been submitted.

The Fourth Circuit has recently explained that a court abuses its discretion in making an award of attorney's fees without establishing a prevailing hourly rate as a guide. <u>Westmoreland Coal Co. v. Cox</u>, 602 F.3d 276, 288-89 (4th Cir. 2010). The Court of Appeals noted in <u>Westmoreland</u>,

> [D]etermination of the hourly rate will generally be the critical inquiry in setting the "reasonable fee," and the burden rests with the fee applicant to establish the reasonableness of a requested rate. In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award.
>
> ...
>
> [The district court] abused its discretion by awarding the hourly rates requested by [plaintiff] in the absence of "satisfactory specific evidence of the prevailing market rates... ." Examples of the type of specific evidence that [the Circuit has] held is sufficient to verify the prevailing market rates are affidavits from other local lawyers who are familiar both with the skills of the fee applicants and more

generally with the type of work in the relevant community. In this case, ... [plaintiff] offered no specific evidence that the hourly rates sought for [plaintiff's] attorney[] coincided with the then prevailing market rates of attorneys in the [Western] District of [North Carolina] of similar skill and for similar work, which [circuit] case law required [plaintiff] to do.

Id., at 289-90, *quoting* Plyler v. Evatt, 902 F.2d 273, 277 (4th Cir. 1990) and

Robinson v. Equifax Information Services, LLC, 560 F.3d 235, 245 (4th Cir.

2009) (other citations omitted).

The motion for attorney's fees therefore must be denied without prejudice.

## ORDER

**IT IS, THEREFORE, ORDERED** that the Plaintiff-Intervenor's Motion for Default Judgment [Doc. 20] and the Plaintiff Equal Employment Opportunity Commission's Motion for Default Judgment [Doc. 21] are hereby **GRANTED IN PART AND DENIED IN PART** as follows:

1. The EEOC and the Intervenor Plaintiff are entitled to compensatory damages in the amount of $59,447.81 on behalf of the Intervenor Plaintiff Hongisto;

2. The motion of the Intervenor Plaintiff Hongisto for back pay is hereby **DENIED** without prejudice;

3. The EEOC is entitled to compensatory damages in the amount of

$30,000 on behalf of Emily Layton;

4.    The EEOC is entitled to compensatory damages in the amount of $15,000 on behalf of Beth Loveday;

5.    The EEOC is entitled to compensatory damages in the amount of $40,000 on behalf of Jaime Winnett;

6.    The EEOC is entitled to compensatory damages in the amount of $10,000 on behalf of Julie Kelly;

7.    The EEOC is entitled to compensatory damages in the amount of $5,000 on behalf of Valerie Koehler; and

8.    The motion of Intevenor Plaintiff Hongisto for an award of attorney's fees is **DENIED** without prejudice.

Signed: July 7, 2010

Martin Reidinger
United States District Judge